Filed 12/1/25  P. v. Glynn CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. RALPH EDMOND GLYNN, Defendant and Appellant. | F088618 (Super. Ct. No. F23902556) OPINION |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Amy K. Guerra and Samuel Dalesandro, Judges.[†]

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Barton Bowers and Clifford E. Zall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[*] Before Levy, Acting P. J., Detjen, J. and Snauffer, J.

[†] J. Guerra presided on January 5, 2024; J. Dalesandro presided over all other hearings pertinent to this appeal.

In a criminal complaint filed April 11, 2023, defendant Ralph Edmond Glynn—then 57 years old—was charged with attempted first degree robbery (Pen. Code,[1] §§ 211, 664 [count 1]), resisting an executive officer by use of force or violence (§ 69 [count 2]), assault with a deadly weapon or instrument upon a peace officer (§ 245, subd. (c) [count 3]), resisting a peace officer (§ 148, subd. (a)(1) [count 4]), and possession of an instrument used for unlawfully injecting or smoking controlled substances (Health & Saf. Code, § 11364 [count 5]). The complaint further alleged defendant was previously convicted of robbery—a qualifying "strike" under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a serious felony (§ 667, subd. (a)(1))—four times. Defendant pled not guilty and denied the special allegations.

On December 18, 2023, defendant filed an application for mental health diversion pursuant to section 1001.36. Following a January 5, 2024 hearing on the matter, the trial court denied the application.

On July 8, 2024, defendant withdrew his earlier plea of not guilty as to counts 1 through 3 and pled nolo contendere thereto. He also admitted the special allegations. In exchange, the prosecutor dismissed counts 4 and 5. On July 19, 2024, defendant filed a *Romero*[2] motion. At an August 28, 2024 sentencing hearing, the trial court exercised its discretion and dismissed three of the four strike priors. It then imposed an aggregate sentence of 16 years four months: (1) a doubled upper term of 10 years—plus five years for the prior serious felony enhancement—on count 3; and (2) a consecutive one year four months (one-third the doubled middle term) on count 1. Execution of punishment on count 2 was stayed pursuant to section 654.

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

On appeal, defendant contends the trial court erroneously denied his application for mental health diversion. We conclude a denial did not constitute an abuse of discretion and affirm the judgment.

**BACKGROUND**[3]

## I.      The incident

On the morning of April 9, 2023, George B. went to an automated teller machine (ATM) to withdraw cash from his account. There, he encountered defendant, who seemed to be "finishing a transaction." After defendant appeared to leave, George approached the ATM and inserted his debit card. Thereafter, defendant "wrapped his arm around George's shoulder area" and jabbed "a pointed object in [George's] right ribcage." Defendant "told George to give him the money or he would 'open him up.' " Before George could comply, defendant "walked away." George spotted police officers in the vicinity and reported what had occurred.

Officer Walker pursued defendant on foot and ordered him to stop. Defendant, who was holding a four-foot-long cane, "looked back but did not stop walking." Walker continued to follow him. At some point, defendant "turned towards . . . Walker and told him he was not the guy they were looking for." He then "raised his cane at . . . Walker" "in a way similar to the way one would point a firearm at someone" and "told . . . Walker that he would shoot him." Defendant "ignored . . . Walker's commands to drop the cane and continued advancing toward . . . Walker with the cane raised above his head."

Officer DeMoss drove to Walker's location and "fired a less than lethal shotgun round at . . . defendant from his patrol vehicle." Defendant "turned his attention to . . . De[M]oss, who was seated in the driver's seat of his patrol vehicle," and "struck the patrol vehicle with his cane several times."

---

[3] The background information is taken from the probation officer's report.

Officer VanDeursen arrived on the scene on foot and deployed his Taser, which "struck . . . defendant in the back." However, the device "did not have any effect" "due to the jacket [defendant] was wearing." Defendant "turned around to face . . . Van[]Deursen and yelled, 'I'm going to shoot you!' " Defendant "ran towards . . . Van[]Deursen with his cane pointed at him" and "struck him twice on the top of his head and once on his left ear." Meanwhile, Walker "ran up behind . . . defendant, grabbed . . . defendant's hands, and pushed him away from . . . Van[]Duersen." After "several minutes of struggling with . . . defendant" on the ground, the officers restrained him. A glass pipe used for smoking methamphetamine was found on defendant's person.

Defendant was transported to the hospital for medical treatment. Because of his "violent behavior," he was handcuffed to the gurney and sedated. A records check subsequently revealed defendant "had just been placed on Pre-Trial Release the week prior stemming from a misdemeanor case against him regarding an altercation with law enforcement."

## II. Defendant's prior criminal history

In 1987, defendant was convicted of receiving stolen property (§ 496). He was placed on probation for three years.

On June 20, 1988, defendant was convicted of petty theft (§ 488). He served 30 days in jail.

On September 8, 1988, defendant was convicted of second degree burglary (§ 459). He was sentenced to two years in prison. Defendant was released on parole, but he returned to prison to finish his term after violating parole (§ 3056).

On November 21, 1991, defendant was convicted of grand theft of property (former § 487.1). He was sentenced to three years in prison. Defendant was released on parole, but he returned to prison to finish his term after violating parole (§ 3056).

On September 19, 1994, defendant was convicted of robbery (§ 211). He was sentenced to three years in prison.

4.

On October 30, 1996, defendant was convicted of grand theft of property taken from the person of another (§ 487, subd. (c)) and found to have served two prior separate prison terms (§ 667.5, former subd. (b)). He was sentenced to five years in prison.

On August 17, 2001, defendant was convicted of one count of first degree robbery (§ 211) and two counts of second degree robbery (*ibid.*) and found to have personally used a knife in the commission of these offenses (§ 12022, subd. (b)(1)). He was also found to have been previously convicted of a "strike" offense (§ 667, subds. (b)–(i)) and serious felony (*id.*, subd. (a)(1)). Defendant was sentenced to 22 years eight months in prison. He was released on parole on June 19, 2020 and discharged therefrom on July 19, 2022. With respect to the first degree robbery conviction, the probation officer's report detailed the following underlying circumstances:

> "On May 8, 2001, at approximately 8:25 p.m., after the victim withdrew money from an ATM, . . . defendant approached him, put a knife to the left side of his neck, and stated, 'Give me the money or I'll cut your fuckin' throat.' . . . [D]efendant took the victim's money he had retrieved from the ATM, along with the money the victim had in his pocket."

With respect to the two second degree robbery convictions, the report detailed the following underlying circumstances:

> "On May 29, 2001, at approximately 2:48 a.m., . . . defendant approached the victim, who was at his business working on vehicles. . . . [D]efendant had a knife in his hand and told the victim, 'I'll stab you.' The victim tried to run away, but . . . defendant grabbed him by the shirt, held the knife toward him, and told him to give him anything he had on him or he would stab him. . . . [D]efendant took the victim's money, forced him into the restroom, and fled the location.

> "On May 29, 2001, at approximately 6:24 p.m., . . . defendant appeared at the Community Food Bank and asked for food. When the woman working there informed him they did not have any food left and she was going to refer him to another agency, he looked at her, smiled, and laughed at her, armed himself with a knife and told her to get back inside. . . . [D]efendant pulled the victim inside and told her to 'drop her dress.' The victim pretended to faint. After a struggle, . . . defendant went through the victim's purse and took her money, debit card, and car keys.

5.

He forced her into the kitchen and then fled the location in the victim's vehicle. He later used her ATM card to withdraw money from her account."

In a criminal complaint filed April 1, 2023, defendant was charged with petty theft (§ 484, subd. (a)) and resisting a peace officer (§ 148, subd. (a)(1)).

### III.     Defendant's section 1001.36 application

Defendant filed an "APPLICATION FOR MENTAL HEALTH DIVERSION" (boldface omitted) on December 18, 2023. He asserted: (1) he suffered from a qualifying mental health disorder; (2) said disorder would respond to treatment; (3) he agreed to waive his right to a speedy trial; (4) he agreed to comply with treatment as a condition of diversion; and (5) he would not pose an unreasonable risk of danger to public safety. Attached to defendant's application was a "PSYCHOLOGICAL EVALUATION" (boldface & underscoring omitted) dated December 12, 2023. Said evaluation was conducted by Zorba Herbert, a clinical psychology student trainee.[4]

Herbert interviewed defendant, who was "in a wheelchair, reportedly from complications from taking [morphine]" "for his foot pain." She also reviewed medical and police records and administered various tests. Herbert diagnosed defendant with "Persistent Depressive Disorder, with mood-congruent psychotic features, with persistent major depressive episode, severe" and "Stimulant Use Disorder, Amphetamine-Type Substance, Moderate" (italics omitted). She opined his condition played a significant role in the commission of the charged offenses.

Regarding defendant's risk of danger to public safety, Herbert noted defendant "scored in the *high* range regarding his risk for future violence and *moderate* for serious physical harm and imminent violence" according to the "Historical Clinical Risk Management-20 V3 (HCR-20)" (italics omitted), a "comprehensive set of professional guidelines for the assessment and management of violence risk." She specified:

---

[4] Holly Skaff, a supervising psychologist, cosigned the evaluation.

"[Defendant] experienced violence and developed early antisocial behaviors in his youth and adolescence. He allegedly experienced sexual and physical abuse by his foster parents and had temper outbursts resulting in physical fights with his peers. In his adulthood, he continued to have physical fights with others, such as his romantic partners, members of his community, and legal authorities. [Defendant] reported in his interview that he currently has no coping mechanisms for his temper nor his negative moods and that he still sometimes feels like physically harming others, placing his behavioral and affective instability, violent attitudes, and coping ability at high risk. [Defendant]'s temper outbursts as an adult have allegedly sabotaged his employment, personal relationships, personal support, and living situations, which are all high risk.

"[Defendant] has a long-reported history of treatment noncompliance and getting into legal trouble. He was incarcerated in juvenile hall and referenced it as a 'second home' due to the number of times he was arrested. Additionally, he has several past robbery and burglary charges and currently has robbery, drug, and assault charges. This places [defendant] at high risk for future compliance issues and other antisocial behaviors. He has high substance abuse risk, as he reported an issue with drug use throughout childhood, adolescence, and adulthood. He reported that he had been high during most of his crimes and that drugs usually motivated his crimes. [Defendant] expressed that he was high whenever he behaved violently as an adult. For [defendant], substance use is a risk factor for violence.

"[Defendant]'s mood disorder and psychosis were rated as high risk, since he stated that command hallucinations encourage him to commit crimes. Furthermore, he experiences active suicidality and depressive thinking, which can reduce the perception of consequences for violence. The depression has contributed to self-isolation, reducing his social support, and increasing his anger and sadness. As his depression increases, the worse the voices allegedly are, which subsequently increase his risk of engaging in violent behavior."

Notwithstanding defendant's "risk factors for future violence," Herbert concluded defendant "would not pose an unreasonable risk of danger if treated in the community." (Boldface & italics omitted.) She stated:

"To reduce [defendant]'s risk of future violence, he should attend treatment for substance use, depression, and psychosis. Ideally, he would gain insight into his substance use, how it impacts his behavior, and how to curb cravings to reduce his likelihood of engaging in crime. Additionally,

7.

reducing his depressive symptoms would possibly reduce the voices he hears that encourage criminal behavior. Treatment should also be focused on behavioral and emotional regulation as well so that he can learn coping skills for his anger, reducing the likelihood of violent temper outbursts. [Defendant] could potentially repair or create a social support system, maintain employment, and a stable residence if he ceases substance use and gains insight and coping skills.

"Conversely, if [defendant] did not attend or comply with treatment, he could quickly go back to using substances and engaging in criminal behavior. Without coping skills for his anger and treatment for his depression and psychosis, he could become triggered and threaten or physically harm anyone he perceives as a threat. Without the ability to maintain relationships or housing, [defendant] could return to drug use and exacerbate his mental health disorders leading to violent behavior towards authority figures, people in his community with goods he desires, and those whom he thinks have substances to get him high."

On January 3, 2024, the prosecution filed a "PEOPLE'S INTENTION TO NOT OPPOSE DEFENDANT'S MOTION" (boldface omitted), conceding defendant "is eligible for relief pursuant to . . . section 1001.36."

## IV.    Hearing

A hearing on defendant's application was held January 5, 2024. In contrast to its earlier filing, the prosecution argued the application should be denied:

"Your Honor, . . . when we read the application, we noticed that – one, that the priors in this matter were 20-years old. The fact that . . . defendant is of a later stage in life, in his late 50s, and even though the evaluation indicated that he does have the moderate- to high-risk for future violence, . . . we were of the belief that he's now at a time of his life where he's ready to turn a corner, that, you know, this 20-year age gap of crimes.

"However, what [the prosecution] wasn't aware of was the fact that he did not comply with the P[RC]S.[5] That four days after the P[RC]S is when he committed these new crimes. And, unfortunately, by the People not having that information, it has changed, unfortunately, . . . the People's position on whether or not [defendant] could go forward with mental health services and turn his life around.

_____

[5] "PRCS" stands for "post-release community supervision."

8.

"The nature of these offenses are very serious. We have a victim out here who was being robbed at an ATM, a place where anyone should feel safe. And then, the further actions of . . . defendant of being in someone else's vehicle posing a threat to them,[6] and the fact that he has just been very violent in terms of resisting arrest. So at this time, the People would add that, unfortunately, we're not able to agree with our initial response that we had submitted. And we do not believe that, because of his risk for future violence, that he would be suitable within what we can offer here in Fresno County for services."

The trial court denied defendant's application. It explained:

"At this time, . . . the Court understands that [defendant] meets the statutory requirements for Diversion. However, . . . the interest of justice doesn't support Diversion in the case.

"The Court does believe that this case is far too serious for Diversion. [Defendant] has prior strikes, although old, for similar crimes. This allegation occurred four days after he was released on pretrial release on the misdemeanor matter. And again, although he is compliant with medication and meeting consistently with the psychiatrist,[7] the Court doesn't believe the prospect of complet[ing] successfully Diversion is good based on the information that's been provided. The Court doesn't believe that the treatment and supervision that we have on Diversion is sufficient for [defendant]'s particular circumstances. So the Court is going to deny the request for Diversion, and the Court's not inclined to use its discretion on this matter."

## DISCUSSION

### I.      Legal overview

"In 2018, the Legislature enacted section 1001.36 to create a program of pretrial diversion for criminal defendants with diagnosed mental health disorders. [Citations.]

---

**6** The prosecution was likely referring to the circumstances underlying the April 1, 2023 charges. (See *ante*, at p. 6.)

**7** The trial court was likely referring to a memorandum filed January 2, 2024, by the County of Fresno's Department of Behavioral Health. Said memorandum indicated defendant (1) had an "active prescription for psychiatric medication" (boldface & capitalization omitted) and was "compliant" therewith; and (2) "is meeting with the psychiatrist consistently despite one refusal on 11/1/23" (italics omitted).

9.

Diversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment. [Citation.] The express purpose of this legislation was to '[i]ncrease[] diversion of [such] individuals' [citation] based on concerns that 'incarceration only serves to aggravate [their] preexisting conditions and does little to deter future lawlessness.' [Citation.] Successful mental health treatment, in contrast, both helps the individual and makes the community safer." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890–891 (*Sarmiento*).)

"Effective January 1, 2023, mental health diversion requires trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program." (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.)[8] "Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged." (*Ibid.*, citing § 1001.36, subd. (b).) There is "a [statutory] presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime" (*Sarmiento*, *supra*, at p. 891) and a court "is directed to find a causal connection 'unless there is clear and convincing evidence that [the mental disorder] was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense' " (*ibid.*, quoting § 1001.36, subd. (b)(2)).

On the other hand, one is suitable for diversion if "(1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of

---

[8] "Initially, the statute listed six criteria that the defendant had to meet [to qualify for diversion]." (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.) "Effective January 1, 2023, . . . the[] first two requirements were recharacterized as 'eligibility' criteria." (*Ibid.*) "The amended statute groups the remaining four criteria in section 1001.36, subdivision (c) to assess the defendant's 'suitability' for diversion." (*Ibid.*)

danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv)." (*Sarmiento*, *supra*, at p. 891, citing § 1001.36, subd. (c).)  An " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).)  "The violent felonies encompassed in [section 667, subdivision (e)(2)(C)(iv)] 'are known as "super strikes" and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment.' [Citation.]" (*People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*).)  Thus, to deny diversion on the grounds the defendant poses an unreasonable risk of danger to public safety, "a trial court necessarily must find the defendant is 'likely to commit a super-strike offense.' [Citation.]" (*Id.* at p. 450.)  "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

"Assuming the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (f)(1)(A)(i).) "Finally, even where defendants make a prima facie showing that they meet all the express statutory requirements, the court may still exercise its discretion to deny diversion. [Citations.]" (*Sarmiento*, *supra*, at p. 892; see § 1001.36, subd. (a) [court "may" grant pretrial diversion if defendant satisfies eligibility and suitability criteria].) "But this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.]  That purpose includes a strong legislative

11.

preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals. [Citation.]" (*Sarmiento*, *supra*, at pp. 892–893.)

## II.     Standard of review

An appellate court will "review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion." (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.) A court abuses its discretion when it "bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*Moine*, *supra*, 62 Cal.App.5th at p. 449; see *People v. Conner* (1983) 34 Cal.3d 141, 149 [" 'Substantial evidence' means that evidence which, when viewed in the light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined."].) "[U]nder the applicable standard of review, we may not substitute our own judgment for that of the trial court, and instead must defer to the trial court's weighing of the evidence." (*People v. Brown* (2024) 101 Cal.App.5th 113, 123–124.)

## III.    Analysis

At the outset, we note the trial court did not perfectly identify the grounds for rejecting defendant's section 1001.36 application. The court prefaced its ruling with the observation defendant "meets the statutory requirements" but "the interest of justice doesn't support Diversion," suggesting it would rely on its residual discretion to deny the application. (See § 1001.36, subd. (a); *Sarmiento*, *supra*, 98 Cal.App.5th at p. 892.) However, the court's rationale touched on the gravity of the charged offenses, defendant's criminal history, and the low likelihood of compliance with treatment, all of which are factors a court may consider in determining whether a defendant will pose an unreasonable risk of danger to public safety. (See § 1001.36, subd. (c)(4); *People v.*

12.

*Pacheco* (2022) 75 Cal.App.5th 207, 213–214 (*Pacheco*) [psychologist's opinion the defendant would not pose unreasonable risk of danger to public safety hinged on abstention from methamphetamine use but the defendant's 14-year history of chronic methamphetamine abuse supported reasonable belief he would not refrain].)[9] In any event, upon our review of the record, we conclude a denial of defendant's section 1001.36 motion did not constitute an abuse of discretion because substantial evidence supported a finding he would pose an unreasonable risk of danger to public safety. (See *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [reviewing court required to uphold a discretionary ruling "if it is correct on any basis, regardless of whether such basis was actually invoked"].)

Between 1987 and 2001, defendant was convicted of numerous offenses. A chronological examination of these offenses—from receiving stolen property and committing petty theft to using knives to perpetrate robberies—evinces a pattern of escalating gravity and violence. (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1265 (*Hall*) [the defendant's engagement "for nearly two decades" "in serious criminal behavior that has become increasingly violent" supported finding of "unreasonable risk of danger to public safety" under § 667, subd. (e)(2)(C)(iv) and § 1170.18, subds. (b) and (c)]; cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 897 ["lack of a prior record of violence"]; *People v. Williams* (2021) 63 Cal.App.5th 990, 1003 (*Williams*) ["*no* prior criminal

---

**9** We recognize the trial court also expressed its belief "the treatment and supervision that we have on Diversion" was insufficient "for [defendant]'s particular circumstances." It is unclear whether the court was relying on section 1001.36, subdivision (f)(1)(A)(i). To the extent it was, its statement appears to wrongly fixate on "the treatment and supervision *that we have on Diversion*" (italics added) rather than "the *recommended* inpatient or outpatient program of mental health treatment" (§ 1001.36, subd. (f)(1)(A)(i), italics added). (See, e.g., *Sarmiento*, *supra*, 98 Cal.App.5th at p. 895, fn. 9 ["[A] court might be legitimately concerned if the evaluation of the defendant suggested the need for psychiatric medication and the recommended program did not provide psychiatric services."].)

record"].)  The cessation of criminal activity between 2001 and 2023 is primarily attributed to his incarceration during that period.

With regard to the instant case, defendant loitered next to an ATM until the victim George arrived.  Defendant pretended to leave to let George use the ATM and then snuck up behind him, prodded a four-foot-long cane into his ribcage, and threatened to hurt him if he did not relinquish his money.  (Cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 897 [charged offense "involved no evidence of a weapon or threat of violence"].)  Although George was at his mercy, defendant immediately fled the scene, presumably because police officers appeared in the vicinity.  The first officer—Walker—tailed defendant and instructed him to stop.  Defendant initially ignored Walker and then insisted "he was not the guy they were looking for."  Shortly thereafter, however, defendant exacerbated the situation by threatening to shoot Walker and advancing on the officer "with the cane raised above his head."  (Cf. *Sarmiento*, *supra*, at p. 897; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1153 [the defendant "immediately turned himself in to [law enforcement] with 'no incident' "].)  A second officer—DeMoss—drove his patrol vehicle to Walker's location and diverted defendant's attention by shooting a "less than lethal shotgun round" at him.  In response, defendant struck DeMoss's vehicle with the cane "several times."  (Cf. *Sarmiento*, *supra*, at p. 897; *Whitmill*, *supra*, at p. 1153.)  A third officer—VanDeursen—arrived on the scene and used a Taser, but to no avail.  Defendant threatened to shoot VanDeursen and struck him "twice on the top of his head and once on his left ear" with the cane.  (Cf. *Sarmiento*, *supra*, at p. 897; *Whitmill*, *supra*, at p. 1153; *Williams*, *supra*, 63 Cal.App.5th at p. 1003 [the defendant "never actually assaulted anyone or engaged in any violence"].)  Defendant was ultimately arrested, but he needed to be handcuffed to a gurney and sedated en route to the hospital due to his "violent behavior."  (See *People v. Graham* (2024) 102 Cal.App.5th 787, 799 [" '[T]here is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court

14.

from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion.' "].)

Herbert, who conducted the psychological evaluation, opined defendant presented a high risk for future violence. (Cf. *Williams*, *supra*, 63 Cal.App.5th at p. 1003 ["uncontroverted opinion of two mental health professionals" the defendant "poses a low risk to public safety"]; *Moine*, *supra*, 62 Cal.App.5th at p. 451 [two psychiatrists determined the defendant "posed a low risk for future assault"].) Though she believed the risk would be mitigated if defendant "attend[ed] treatment for substance use, depression, and psychosis," she herself acknowledged defendant's "long-reported history of treatment noncompliance and getting into legal trouble" (see *People v. Watts* (2022) 79 Cal.App.5th 830, 837 & fn. 2 [the defendant failed to attend therapy appointments and medical evaluation]) as well as his persistent "drug use throughout childhood, adolescence, and adulthood" (see *Pacheco*, *supra*, 75 Cal.App.5th at pp. 213–214). Moreover, the April 9, 2023 incident occurred a mere four days after defendant was placed on pretrial release in connection with the earlier misdemeanor petty theft charge. A court's "lack of confidence that [defendant] was amenable to treatment in light of his history of noncompliance" "was an independently permissible basis for concluding the requirements of section 1001.36 had not been met." (*Watts*, *supra*, at p. 837.)

In view of the foregoing evidence, we conclude a trial court could reasonably infer defendant "presents an elevated—and escalating—risk of not only threatening violence, but also using deadly force." (*Hall*, *supra*, 247 Cal.App.4th at p. 1266.)[10] Therefore, we uphold the denial of defendant's section 1001.36 application.

---

[10] Defendant points out neither his prior convictions nor the charged crimes involved a super strike. Though true, this fact is not dispositive. (See *Hall*, *supra*, 247 Cal.App.4th at p. 1266; see also *Pacheco*, *supra*, 75 Cal.App.5th at p. 213 ["The list [set forth under section 667, subdivision (e)(2)(C)(iv)] speaks to crimes that may be committed in the future."].)

## **DISPOSITION**

The judgment is affirmed.